***********
The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Homick and the briefs and arguments of the parties. The appealing parties have not shown good grounds to reconsider the evidence, receive further evidence, or rehear the parties. The Full Commission affirms with modifications the Opinion and Award of Deputy Commissioner Homick and enters the following Opinion and Award:
 *********** EVIDENTIARY MATTERS
Plaintiff filed a Motion to Receive Evidence or in the Alternative to Hold Issue of Compensability of Cervical Spine Surgery in Abeyance Pending Resolution of Other Issues before the Commission on June 28, 2011. Defendants responded and objected to the same on July 11, 2011. IT IS HEREBY ORDERED that that plaintiff's Motion to Receive Evidence or in the *Page 2 
Alternative to Hold Issue of Compensability of Cervical Spine Surgery in Abeyance Pending Resolution of Other Issues before the Commission is GRANTED and the issue of compensability of cervical spine surgery is reserved for future determination.
 ***********
The Full Commission finds as a fact and concludes as a matter of law the following, which were entered into by the parties as:
 STIPULATIONS
1. Plaintiff alleges to have sustained a compensable injury on January 7, 2009.
2. An employment relationship existed between plaintiff and defendant-employer on January 7, 2009.
3. Workers' compensation insurance coverage existed on the date of injury.
4. ACE USA/ESIS was the carrier for defendant-employer at all times relevant to this proceeding.
5. After the hearing before the Deputy Commissioner, the parties stipulated that plaintiff's average weekly wage is $1,200.00, yielding a compensation rate of $800.00
6. The compensability of this accident has been admitted under New York law and plaintiff has been provided with benefits under New York law.
7. The parties stipulated to the admissibility of the following documents, which were received into evidence:
 • Exhibit 1: Pre-Trial Agreement; and
 • Exhibit 2: Plaintiff's Medical Records, Workers' Compensation Checks, Medical Bills, NY Pleadings, NC Pleadings (292 pages). *Page 3 
In addition, the following exhibits were introduced and received into evidence before the Deputy Commissioner:
 • Plaintiff's Exhibit 1: Map of NY;
 • Plaintiff's Exhibit 2: MapQuest Document — Route from NC to NY;
 • Plaintiff's Exhibit 3: NY Workers' Compensation Form dated August 27, 2009;
 • Plaintiff's Exhibit 4: NY Workers' Compensation Form dated October 23, 2009.
 • Defendants' Exhibit 1: NY Workers' Compensation Board Form C-240.
 ***********
As set forth in the Pre-Trial Agreement and Deputy Commissioner Homick's March 11, 2011 Opinion and Award, the Full Commission addresses the following:
 ISSUES
1. Does North Carolina have concurrent jurisdiction of this claim, pursuant to N.C. Gen. Stat. § 97-36?
2. If so, what are the compensable consequences of plaintiff's work injury of January 7, 2009?
3. In addition to the admitted right shoulder injury, are plaintiff's neck/cervical problems causally related to his on-the-job accident of January 7, 2009?
4. Is plaintiff entitled to reimbursement of medical costs that he has incurred?
5. Is there a substantial risk that plaintiff will need additional medical care to provide relief, effect a cure or prevent further deterioration of the injuries he sustained in the accident of January 7, 2009? *Page 4 
6. If the North Carolina Industrial Commission has jurisdiction over this claim, are defendants entitled to a credit for any and all benefits paid to plaintiff under the laws of the State of New York?
 ***********
Based upon the preponderance of the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, plaintiff was 55 years old and a lifelong resident of Cherokee County, North Carolina, with the exception of six years of service in the United States Army. Plaintiff left school in the 10th grade and has not earned a Certificate of General Educational Development (GED).
2. Plaintiff has worked in the telephone industry since 1980, primarily as a cable splicer. In addition to his experience in the telephone cable installation and repair business, plaintiff owned his own bucket truck which enhanced his employability. The boom and bucket on the truck allowed plaintiff to work at heights up to 34 feet.
3. Throughout his career, plaintiff worked for several staffing companies performing telephone cable installation and repair. While working for the company, Harris McBurney, plaintiff met and became friends with Danny Day, who was a foreman for that company. Harris McBurney is a contract company that provides temporary staffing to telecommunication companies for storm work, and workload adjustments.
4. Danny Day later commenced work for defendant-employer. It appears that Butler International, Inc. was incorporated in Maryland and its principal place of business in January 2009 was in Florida. *Page 5 
5. Later in 2009, Butler International sold certain assets to Butler America, a privately held staffing and outsourcing solutions firm, located in Connecticut.
6. Sometime after Christmas in 2008 and before January 1, 2009, while at his home in Cherokee County, North Carolina, plaintiff received a telephone call from Danny Day, who at that time was a supervisor for defendant-employer. As he testified, Mr. Day asked plaintiff to commence work for defendant-employer at a job site in the Norwich, New York area, where it was upgrading operations for Frontier, a telecommunications company.
7. Plaintiff had previously been contacted by defendant-employer when there was a potential strike by ATT employees and he was "in their system." The strike did not occur and therefore, plaintiff did not commence work for defendant-employer at that time.
8. During the telephone conversation between Danny Day and plaintiff regarding the job in New York with defendant-employer, plaintiff was initially offered an hourly wage of $27.00, as a telephone cable splicer with his own transportation. Plaintiff refused the $27.00 per hour offer as he thought he should be paid at a higher rate since Danny Day specifically requested that plaintiff bring his bucket truck to be used in the course of his employment.
9. After rejection of the first offer, Danny Day called plaintiff again and informed him that he had received authority to pay plaintiff $30.00 per hour since plaintiff would be providing his own bucket truck.
10. Danny Day stated that when he offered the job to plaintiff at the higher hourly rate of pay, plaintiff accepted the offer from his home in North Carolina. Danny Day then requested that plaintiff travel to New York as soon as possible.
11. Danny Day explained that plaintiff would still have to pass a drug test and a background check. Mr. Day stated that sometimes the drug test is completed before a person *Page 6 
commences work, but in this case, it was to have been performed after plaintiff arrived in New York.
12. Relying on the fact that he had a contract to work in New York, plaintiff left his home in Cherokee County, North Carolina on or about Saturday, January 3, 2009, and proceeded to drive his bucket truck more than 800 miles to the jobsite in the Norwich, New York area. Plaintiff testified that he never would have left North Carolina if he had not known for certain that he had a job with defendant-employer in New York.
13. The Full Commission finds that the last act necessary to make a binding contract of employment with defendant-employer occurred during the telephone conversation between plaintiff and Danny Day while plaintiff was at home in Cherokee County, North Carolina. During that conversation, Mr. Day offered plaintiff a position as a telephone cable splicer and plaintiff accepted his offer. Plaintiff relied upon the fact that a contract had been formed in North Carolina and proceeded to New York driving his bucket truck. The Full Commission finds plaintiff's testimony concerning the employment contract to be credible and confirmed by the testimony of Danny Day, a supervisor for defendant-employer.
14. When plaintiff arrived in the New York area, he met Danny Day to discuss the responsibilities of the job. Plaintiff then drove his bucket truck from Mr. Day's hotel in the Binghamton, New York area to the office of Frontier in Norwich, New York, where he obtained additional instructions regarding his duties. At the office of Frontier, plaintiff also loaded necessary materials onto his truck.
15. Plaintiff was paid for several hours of work before he was instructed to travel to a hospital in Norwich, New York, where he submitted to a drug screening. Plaintiff was also paid *Page 7 
for the time he participated in the drug screening. Plaintiff commenced his work duties for defendant-employer on or about Monday, January 5, 2009.
16. On January 7, 2009, in the course of performing his work duties for defendant-employer in New York, plaintiff slipped and fell on ice, landing on his right shoulder. That same day, plaintiff presented to the Emergency Department of Wilson Memorial Regional Medical Center in Johnson City, New York with a chief complaint of right shoulder pain. A shoulder x-ray revealed that plaintiff had a right AC joint separation and plaintiff was instructed to wear a shoulder immobilizer. Defendants accepted plaintiff's right-arm injury and provided plaintiff with workers' compensation benefits under the laws of the State of New York.
17. As plaintiff was unable to work due to his injury, he returned home to North Carolina for ongoing treatment. On January 26, 2009, plaintiff presented to Dr. Martin Senicki, an orthopedic specialist in Sylva, North Carolina, with complaints of right shoulder pain, cervical pain, and upper thoracic pain. Dr. Senicki diagnosed plaintiff with a right shoulder AC separation as well as cervical and upper thoracic strains related to the right shoulder separation. Dr. Senicki recommended physical therapy and prescribed Percocet for pain and Flexeril for spasms. Dr. Senicki opined that plaintiff was capable of light duty work only, with no use of his right arm. If this was not available, Dr. Senicki opined that plaintiff was totally disabled.
18. Dr. Senicki continued to treat plaintiff conservatively, while plaintiff participated in physical therapy at the Murphy Medical Center. Plaintiff reported experiencing neck problems from his first session on January 29, 2009, and thereafter.
19. As plaintiff did not significantly improve with conservative care, on April 9, 2009, Dr. Senicki performed a right shoulder AC joint reconstruction with an anterior tibialis tendon allograft. *Page 8 
20. As of August 24, 2009, Dr. Senicki opined that plaintiff had reached maximum medical improvement with regard to his right upper extremity. As a result of the fall on January 7, 2009, and his injury to his right shoulder, Dr. Senicki opined that plaintiff had a 25% permanent partial impairment to his right upper extremity. Dr. Senicki released plaintiff to return to work with permanent restrictions of no lifting more than 25 pounds with his right arm, no repetitive overhead lifting, and no climbing.
21. After his surgery, plaintiff progressed well with regard to the right shoulder but on March 23, 2010, returned to Dr. Senicki with cervical spine problems and pain radiating into his left shoulder. Dr. Senicki noted that plaintiff has experienced progressive pain in his cervical spine since his January 7, 2009 work injury and he thought that some of this pain may be related to his right shoulder. Although plaintiff was experiencing mild right shoulder discomfort, Dr. Senicki opined that it is actually paracervical, with pain also in the left shoulder and associated numbness and weakness.
22. X-rays of plaintiff's cervical spine revealed degenerative disk disease at C5-6 and C6-7, with neuroforaminal spurring, suggesting probable neuroforaminal stenosis, which Dr. Senicki opined was aggravated by plaintiff's January 7, 2009 work injury. Dr. Senicki recommended an MRI of plaintiff's cervical spine and opined that it was reasonably required to effect a cure, give relief and lessen plaintiff's pain and disability arising out of the September 7, 2009 work injury.
23. Dr. Senicki testified that at the time of plaintiff's fall on January 7, 2009, plaintiff experienced both right shoulder and neck complaints; however, the decision was made to focus first on the right shoulder to determine the extent treatment of the shoulder would alleviate plaintiff's cervical complaints. Dr. Senicki opined that it is fairly common for recovering shoulder *Page 9 
patients to have cervical pain partially because of wearing a sling and partially because of unconscious guarding of the shoulder.
24. On October 23, 2009, defendants filed a New York workers' compensation form to terminate the payment of plaintiff's benefits on the basis that there was no evidence of ongoing disability after August 24, 2009. Pursuant to the form, plaintiff received $19,800.00 in disability benefits under New York law from January 8, 2009, through October 8, 2009, including temporary total disability benefits from January 8, 2009, through August 24, 2009, and temporary partial disability benefits from August 24, 2009, through October 8, 2009.
25. On November 18, 2009, a hearing was conducted in New York upon plaintiff's request to hold the New York case in abeyance while plaintiff sought to have his case adjudicated under the workers' compensation laws of the State of North Carolina.
26. On November 23, 2009, Judge Arthur Levy granted plaintiff's request to hold the New York case in abeyance pending a decision by the North Carolina Industrial Commission.
27. On August 10, 2010, plaintiff last presented to Dr. Senicki for follow-up regarding the results of the cervical spine MRI. Plaintiff continued to experience persistent back pain and radiating left upper extremity pain in the C6-C7 distributions. The MRI confirmed moderate disk degeneration at C5-6 and C6-7 with central bulging at C5-6 and left-sided neuroforaminal impingement by spurring and left-sided neuroforaminal narrowing at C6-7.
28. On the issue of causation, Dr. Senicki opined that plaintiff's cervical condition was aggravated by his fall on January 7, 2009. Specifically, Dr. Senicki opined that more likely than not, plaintiff's cervical and upper thoracic strains were related to the January 7, 2009 injury. Dr. Senicki also opined that it was more likely than not that plaintiff's neuroforaminal stenosis and or spinal stenosis were aggravated by plaintiff's January 7, 2009 work injury, although he *Page 10 
subsequently admitted that he does not normally treat cervical spines and would defer to a spine specialist for a more detailed causation opinion outside of an aggravation of a generalized neck strain.
29. Based upon the preponderance of the medical evidence, the Full Commission finds that plaintiff's cervical and upper thoracic strains are related to his January 7, 2009 work injury. The Full Commission does not address in this Opinion and Award the issue of whether plaintiff's current cervical spine complaints, which may require surgical intervention, are related to his January 7, 2009 work accident.
30. Dr. Senicki opined that plaintiff was unable to return to work due to his persistent back pain, radiating left upper extremity pain in the C6-C7 distributions and left upper extremity weakness. Dr. Senicki recommended an evaluation with an orthopedic surgeon and physical therapy.
31. Dr. Senicki opined that plaintiff has not yet at maximum medical improvement with respect to his related cervical spine condition.
32. Defendant-employer has not offered plaintiff employment within the work restrictions assigned by Dr. Senicki.
33. Despite the permanent restriction from climbing that prevents plaintiff from returning to telephone splicing, plaintiff testified that he has looked for work through the Cherokee County Unemployment Office and North Carolina Vocational Rehabilitation, but has been unsuccessful in locating suitable work. To further enhance his employability, plaintiff has attended classes at Tri-County Community College since March 2010 to obtain his General Educational Development Certificate. *Page 11 
34. The Full Commission finds that plaintiff would benefit from vocational rehabilitation.
35. Defendants have previously paid plaintiff $19,800.00 in disability benefits under New York law from January 8, 2009, through October 8, 2009, the date Dr. Senicki opined that plaintiff was at maximum medical improvement with respect to his shoulder. From January 8, 2009, through August 24, 2009, defendants paid plaintiff at the rate of $550.00 per week which constitutes an underpayment of the amount due under North Carolina law of $250.00 per week. In addition, defendants paid plaintiff $300.00 per week for the 6.60 weeks from August 24, 2009 to October 8, 2009 which constitutes an underpayment of $500.00 per week.
36. Defendants have paid no further workers' compensation benefits to plaintiff under New York or North Carolina law since October 8, 2009.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. N.C. Gen. Stat. § 97-36 provides that North Carolina has jurisdiction over injuries occurring outside the state if the contract of employment was made in North Carolina, if the employer's principal place of business is in North Carolina, or if the employee's principal place of employment is within North Carolina. The first part of the statute is the only applicable provision to the facts of this case.
2. In this case, plaintiff's contract of employment with defendant-employer was made in North Carolina. Murray v. AhlstromIndus. Holdings, Inc., 131 N.C. App. 294, 506 S.E.2d 724 (1998). Defendant-employer's offer of employment was made by telephone to plaintiff at his *Page 12 
home in North Carolina and was accepted by plaintiff in the telephone call. The acceptance and offer constituted the final act necessary to make the employment contract a binding obligation. Any paperwork and drug screening subsequently completed by plaintiff was "more of a consummation of the employment relationship than the `last act' required to make it a binding obligation."Id. at 297, 506 S.E.2d at 727. Thus, the North Carolina Industrial Commission has jurisdiction over plaintiff's workers' compensation claim. N.C. Gen. Stat. § 97-36.
3. On January 7, 2009, plaintiff sustained a compensable injury by accident to his right shoulder, as well as cervical and thoracic strains, arising out of and in the course of his employment with defendant-employer. N.C. Gen. Stat. § 97-2(6).
4. A fundamental tenant of North Carolina workers' compensation law is that the employee has the burden of proving both the existence and extent of his disability. Clark v. Wal-Mart,360 N.C. 41, 43, 619 S.E. 2d 491, 493 (2005). A claimant can satisfy his burden of proof in one of four ways: (1) the production of medical evidence that he is physically or mentally, as a consequence of the work related injury, incapable of work in any employment; (2) the production of evidence that he is capable of some work, but that he has, after a reasonable effort, been unsuccessful in obtaining employment; (3) the production of evidence that he is capable of some work but that it would be futile because of preexisting conditions, i.e., age, inexperience, lack of education, to seek other employment; or (4) the production of evidence that he has obtained other employment at a wage less than that earned prior to the injury. Russell v. Lowes Prod.Distribution,108 N.C. App. 762, 765, 425 S.E.2d 454, 457 (1993) (internal citations omitted). Plaintiff was released to work with light duty restrictions, which defendant-employer was unable to accommodate. Plaintiff has made reasonable efforts to obtain employment within his restrictions but has been unsuccessful. *Page 13 
5. As a direct and proximate result of plaintiff's compensable injury by accident on January 7, 2009, plaintiff has been unable to earn the same or greater wages as he was earning in the same or any other employment. As a result, plaintiff is entitled to receive ongoing temporary total disability compensation at the rate of $800.00 per week, beginning January 8, 2009, and continuing until further order of the Commission. N.C. Gen. Stat. § 97-29.
6. As a direct and proximate result of plaintiff's compensable injuries by accident on January 7, 2009, plaintiff is entitled to all medical expenses incurred or to be incurred, including vocational rehabilitation, for his for so long as such examinations, evaluations and treatments may reasonably be required to effect a cure, give relief or tend to lessen plaintiff's period of disability. Dr. Senicki is approved as plaintiff's authorized treating physician. N.C. Gen. Stat. §§ 97-2(19), 97-25.
7. Defendants are entitled to offset the compensation for temporary total disability by the amount of disability compensation plaintiff received from defendants under the laws of the State of New York. N.C. Gen. Stat. § 97-36.
 ***********
Based upon the foregoing stipulations, findings of fact, and conclusions of law the Full Commission makes the following:
 AWARD
1. Subject to an attorney's fee hereinafter approved, defendants shall pay temporary total disability compensation to plaintiff at the rate of $800.00 per week from January 8, 2009, and continuing until further Order of the Industrial Commission.
2. Defendants shall pay all past and future medical expenses incurred or to be incurred as a result of plaintiff's compensable injury by accident to his right shoulder and for his *Page 14 
cervical and thoracic strains, including the provision of vocational rehabilitation, for so long as such examinations, evaluations and treatments may reasonably be required to effect a cure, give relief or tend to lessen plaintiff's period of disability. Dr Senicki is approved as plaintiff's authorized treating physician.
3. Defendants shall receive an offset against the accrued compensation due plaintiff under paragraph 1 of this Award in an amount equal to the amount of compensation paid to plaintiff under the workers' compensation laws of the State of New York.
4. A reasonable attorney's fee in the amount of twenty-five percent (25%) of the compensation due plaintiff under Paragraph One of this Award is approved for plaintiff's counsel and shall be paid by defendants as follows: twenty-five percent (25%) of the accrued compensation due plaintiff, after the offset due defendants, shall be deducted from that amount and be paid directly to plaintiff's attorney. Thereafter, defendants shall pay every fourth compensation payment due plaintiff to plaintiff's counsel as an attorney's fee.
5. Defendants shall pay the costs.
This the 23rd day of September, 2011.
 S/___________________ DANNY LEE McDONALD COMMISSIONER
CONCURRING:
 S/___________________ STACI T. MEYER COMMISSIONER *Page 15 
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER *Page 1